1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANABEL L. QUINTERO, | Case No.  1:13-cv-00478-SKO |
| Plaintiff, | **ORDER ON PLAINTIFF'S COMPLAINT** |
| v. | (Doc. No. 1) |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security, | |
| Defendant. | |
| _____/ | |

## I.  INTRODUCTION

Plaintiff Anabel Lopez Quintero ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 7, 8.)

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1965, and completed high school in the United States. (Administrative Record ("AR") 40, 54.)   In either 2000 or 2007, Plaintiff completed clerical classes.  (AR 56, 155.)  Plaintiff's past jobs include bag machine operator and cannery worker. (AR 57.)   On May 14, 2010, Plaintiff filed applications for DIB and SSI benefits, alleging disability beginning May 29, 2007, due to bilateral total knee replacement, depression, and anxiety.   (AR 41, 149, 154.)   In a November 2010 disability report, Plaintiff indicated her conditions had changed, including that her legs were swelling more often and her migraines had worsened by degree and frequency.  (AR 167.)

**A.     Relevant Evidence**

**1.      Migraine Headaches**

Plaintiff treated with Andres Arellano, M.D., from 2007 until 2011.  (AR 287-339, 359-60.)   In February 2007, Plaintiff's treatment records indicated she was prescribed Vicodin for migraine headaches and knee pain.  (AR 339.)   In April 2007, Plaintiff's migraines were noted to be stable with medication, and Plaintiff reported in May 2007 that her migraines were "better." (AR 329, 335.)  In August 2007, Plaintiff reported that her migraines were "exacerbated," but by November, her migraines were again noted to be stable.  (AR 314, 325.)   In July 2008, Plaintiff's treatment records indicate that she was advised to stop taking medication for her migraines, as it may have been causing rebound headaches.  (AR 304.)   In December 2008, Plaintiff's treatment records note that Plaintiff had a history of migraines, but she was functioning well.  (AR 302.) Treatment notes from September 2009 and November 2009 discussed Plaintiff's "chronic" migraines.  (AR 295, 297.)

On August 28, 2010, Plaintiff underwent a psychiatric evaluation administered by Gerardine Gauch, Psy.D.  (AR 250-55.)  The examination dealt with Plaintiff's depression, but Plaintiff reported that she suffered migraine headaches "that are familial." (AR 251.)  Dr. Gauch diagnosed Plaintiff with migraine headaches pursuant to Plaintiff's statements regarding her history with migraines.  (AR 254.)

///

1       At the time Plaintiff filed her disability claim, she submitted a disability report noting she

2   was prescribed medication for migraines, but she did not list this as a condition that prevented her

3   from working.  (AR 154, 157.)  In November 2010, Plaintiff completed another disability report

4   noting that her migraines had gotten worse and that she experienced them more frequently.  (AR

5   167.)  She indicated she was unable to drive because of the headaches and the medication she

6   takes for her conditions.  (AR 170.)  On December 3, 2010, Plaintiff completed a function report

7   stating her migraines cause her pain, and she was required to lie down for up to 3 hours every day

8   depending on the level of pain from her leg, her migraines, and her anxiety.  (AR 181.)

9       **2.      Physical Conditions**

10      In June 2007, Robert M. Cash, M.D., completed a right knee replacement on Plaintiff,

11  followed by a left knee replacement in October 2007.  (AR 240-41, 243-44.)  In December 2007,

12  Plaintiff was still experiencing pain in her left knee, but noted it was mildly improving.  (AR 228.)

13  She continued to have tightness in her knee, which seemed to "wax and wane."  Plaintiff was

14  working on strengthening her knee, and continued to ambulate with a cane.  (AR 228.)   On

15  examination, her left knee had no marked erythema; Plaintiff was tender to palpation to both the

16  medial and lateral joint lines; Plaintiff's range of motion is from neutral to 100 degrees.  (AR 228.)

17  Dr. Cash indicated Plaintiff remained unable to work her usual and customary job.  (AR 228.)

18      In February 2008, Plaintiff returned for a follow up with Dr. Cash, and reported bilateral

19  knee pain and discomfort, but indicated she was otherwise doing quite well, with no significant

20  complaints.  (AR 227.)  On examination, Dr. Cash indicated slight patellofemoral crepitus with

21  motion of the knees, but it was "minimal."  Dr. Cash noted Plaintiff was ambulatory, but had

22  experienced an increase in her weight.   (AR 227.)   Dr. Cash recommended continued

23  strengthening efforts, weight loss efforts, a transcutaneous electrical nerve stimulation ("TENS")

24  unit as necessary for pain management, and reassessment as necessary.  (AR 227.)

25      In April 2008, Plaintiff returned to Dr. Cash.  (AR 226.)  Plaintiff reported experiencing

26  some pain in her left knee, but improving greatly over time.  The examination was normal and

27  revealed "excellent mobility overall, normal sensation, no instability, and she [was] independently

28  ambulatory."   (AR 226.)   Dr. Cash recommended continuing strengthening efforts and

1    reassessment in four to six months.  She was to undertake "[a]ctivities as tolerated" and was to be

2    "[o]ff work as necessary."

3        In June 2008, Plaintiff reported "quite a bit of pain" in her left knee, but her right knee was

4    giving her no problems.  (AR 225.)  Upon examination Plaintiff was still obese, both knees were

5    "moving well," sensation and capillary refill were within normal limits, no crepitus was noted, and

6    there was no evidence of subluxation, but her left knee had "some pain with motion."  (AR 225.)

7    Dr. Cash opined that her pain complaints would resolve, but indicated the need for new

8    radiographs of her knees to rule out any component problems.  (AR 225.)  A June 12, 2008, x-ray

9    of the left knee revealed near anatomic alignment with no acute radiographic abnormalities.  (AR

10   245.)  On June 24, 2008, Dr. Cash reported that Plaintiff's knee radiographs revealed well-seated

11   arthroplasty components, she had excellent flexion-extension overall, good collateral and anterior-

12   posterior stability, and no sign of infection.  (AR 224.)  He advised that she avoid "provocative

13   activities" which worsened discomfort, but recommended that she continue doing exercises and

14   using her knees.  (AR 224.)

15       In August 2008, Dr. Cash noted some slight laxity (looseness) in the left knee and gave

16   Plaintiff a neoprene sleeve for her knee to improve confidence and function.  (AR 223.)  Dr. Cash

17   said she should return to activities as tolerated.  (AR 223.)

18       In October 2008, Dr. Cash noted that Plaintiff had some discomfort on motion but fair

19   functional motion and range, good overall stability, and that she was doing well and "going to

20   return to work activities."  (AR 222.)

21       In May 2010, Dr. Cash again saw Plaintiff, who complained of bilateral knee pain.  (AR

22   221.)  Examination revealed Plaintiff had some looseness in her knees bilaterally, she had well-

23   healed incisions, fair flexion-extension, good collateral and anterior-posterior stability, and fair

24   patellofemoral alignment.  (AR 221.)  Dr. Cash noted that Plaintiff's knees were limiting her

25   ability to ambulate, stand, and climb stairs, and he opined that she was unable to work as a

26   cannery worker or factory worker at the time.  (AR 221.)

27       In September 2010, state agency physician, M. Nawar, M.D., reviewed the records and

28   opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently;

stand and/or walk for 2 hours in an 8-hour day; sit for 6 hours in an 8-hour day; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes or scaffolds.  (AR 256-60.)   Upon reviewing Plaintiff's medical records on December 23, 2010, Ernest Wong, M.D., affirmed Dr. Nawar's assessment.  (AR 341.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  On August 3, 2011, the ALJ held a hearing at which Plaintiff and a vocational expert ("VE") testified. (AR 37-62.)

**1.      Plaintiff's Testimony**

Plaintiff testified that she earned a high school diploma, is able to read the newspaper, and can perform simple addition and subtraction.  (AR 41.)  She was a sanitation worker from 1995 to 1997, and a bag operator for Hershey's chocolate company from 1997 to 2007.  (AR 41.)  She worked briefly in 2009 at a winery pulling bottles from the line and putting them into a bin, but she only worked for two days.  She stopped working because "they didn't call [her] back."  (AR 49.)  Plaintiff was having problems at the job because she had to stop frequently due to pain, and often asked her employers to let her use the bathroom or drink water because she was fatigued. (AR 50.)

Physically, Plaintiff started having problems with her knees while she was working at Hershey's, and she missed "a lot" of work as a result of her arthroscopy surgery.  (AR 50.)  The knee replacement alleviated some of her pain, but did not help with flexibility; she cannot kneel or "do things like that."  (AR 48.)  Plaintiff has pain in both her knees and her right hip because she puts all her weight on the right side.  (AR 47.)  Plaintiff uses a cane prescribed by the doctor when she leaves the house.  (AR 48, 50.)  On May 29, 2007, Plaintiff had bilateral knee replacement. (AR 41.)  She also suffers from depression and anxiety.  (AR 41.)  She has problems eating and sleeping; she does not eat during the day, but at night to deal with her anxiety, she eats a lot and gains weight.  (AR 45.)  She sleeps approximately five hours total each night, but awakens every two hours.  (AR 45.)

Plaintiff testified that she sees a doctor every three months for mental health issues.  (AR 46.)  She takes Fioricet to treat migraine headaches, but she cannot take it with hydrocodone, which is prescribed for her knee pain.  Thus, if she suffers a migraine attack and takes the Fioricet, she also suffers pain in her legs all day without the hydrocodone.  (AR 46.)  Plaintiff's migraines are more painful on one side.  (AR 53.)  When she experiences a migraine, she isolates herself and sometimes vomits.  (AR 53.)  She experiences migraine attacks for sometimes a whole week, and at other times only two or three times a month.  (AR 53.)   In addition to the Fioricet and hydrocodone, Xanax and Cymbalta are prescribed for depression.  (AR 47.)  Xanax makes her forgetful and unable to concentrate.  (AR 47.)  Plaintiff's depression and anxiety cause her to "cry for anything."  (AR 48.)  She is unable to concentrate, and her mood may be happy one moment and sad the other moment.  The medicine for her mental conditions makes her sleepy.  (AR 49.)

Plaintiff lives with her husband and three adult sons.  (AR 42.)  She is able to dress and bathe herself without help; perform chores around the house; cook "[a] little bit"; wash dishes; and grocery shop.  She is unable to mop, sweep, do laundry, perform yard work, or garden.  (AR 43.)  She reads for 15 minutes at a time and enjoys history books.  (AR 43.)  Plaintiff watches television a couple of hours each day; she does not exercise.  (AR 44.)  She stopped driving a car after she was unable to locate her car in a Target parking lot – her husband now drives her where she needs to go.  (AR 44-45.)   When Plaintiff goes shopping, she uses a scooter.  (AR 51.)  In her shower she has an assistive device like a chair that allows her to shower in a seated position.  (AR 51.)  Her knees stiffen if she sits for long periods, and she struggles to stand up after she has been seated with her legs down.  (AR 52.)  When she is at home, she needs to get up and stretch; she spends about three hours a day on the couch, but when she has a headache, she lies in bed all day.  (AR 52.)  Plaintiff can walk or stand about 10 minutes at one time; she can sit for up to 20 minutes; she can lift up to 5 pounds.  (AR 47.)

### 2. Vocational Expert's Testimony

Michael Stinson testified as a VE at Plaintiff's hearing.  (AR 57.)  The VE characterized Plaintiff's past work as a bag machine operator, which is medium level exertional work in the

Dictionary of Occupational Titles ("DOT"),[2] and "cannery worker," which requires light level exertion.[3]  (AR 57.)

The ALJ posed one hypothetical to the VE.  The ALJ asked the VE to assume a hypothetical person of the same age, education, and work experience as Plaintiff, who could perform light work, but only occasionally balance, stoop, bend, kneel, crouch, or crawl.  (AR 57-58.)  The ALJ asked the VE to also assume this individual had a fair ability to understand, remember, and carry out complex and detailed instructions; maintain attention and concentration; relate to co-workers; deal with the public; and deal with changes in the workplace.  The ALJ defined "fair" to mean limited, but satisfactory.  (AR 58.)  The ALJ asked the VE whether the hypothetical person could perform Plaintiff's past work.  The VE responded that such a hypothetical person could not perform Plaintiff's past work.  (AR 58.)  However, the VE indicated the hypothetical person could perform alternate jobs such as document preparer, addressor, or information clerk.  (AR 59.)

Plaintiff's counsel then posed a second hypothetical to the VE.  Counsel asked the VE whether any of the alternate jobs would permit the hypothetical person proposed in the ALJ's scenario to sit with her legs straight out at least half the day.  (AR 60.)  The VE responded that it would depend on how high the legs would need to be elevated.  If the surface where the feet would be resting was no more than 6 to 12 inches off the ground, then it would normally fit under a work table or desk.  If it were higher than that, it would be difficult to sit under the work table.  (AR 60.)  Thus, if this person was sitting with her feet parallel to the ground, which is above 12 inches, that would rule out the ability to work in a sedentary job.  (AR 61.)  Plaintiff's counsel then asked whether, if the hypothetical person missed two to three days of work per week due to psychiatric problems or migraines, the person would be able to perform the alternative work identified by the VE.  (AR 61.)  The VE responded that such absences would rule out the ability to work.  (AR 61.)

---

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. §§ 404.1567(c), 416.967(c).

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).

1 **3.    ALJ's Decision**

2       On September 1, 2011, the ALJ issued a decision finding Plaintiff not disabled since May

3 29, 2007.  (AR 31.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial

4 gainful activity since the alleged onset date of May 29, 2007; (2) had the severe impairments of

5 bilateral total knee replacement, obesity, anxiety, and depression; (3) did not have an impairment

6 or combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R.

7 Part 404, Subpart P, Appendix 1 ("the Listing"); (4) could not perform her past relevant work; but

8 (5) could perform other work available in significant numbers in the national economy.  (AR 21-

9 31.)  The ALJ determined Plaintiff had the residual functional capacity ("RFC")[4] to perform

10 sedentary work; lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; never

11 climb ladders; and occasionally climb stairs, balance, stoop, bend, kneel, crouch, and crawl.  She

12 had a fair ability to understand, remember, and carry out complex and detailed job instructions,

13 maintain attention and concentration, relate to co-workers, deal with the public, and deal with

14 changes in the workplace.  (AR 26.)

15       Plaintiff sought review of this decision before the Appeals Council.  (AR 11.)  On

16 February 27, 2013, the Appeals Council denied review.  (AR 1-6.)  In denying review, the Appeals

17 Council received and made part of the record additional evidence from Plaintiff including a

18 statement of contentions of Plaintiff's counsel; a questionnaire from Golden Valley Medical

19 Center; and a questionnaire completed by Dr. Cash on November 16, 2012.  (AR 5.)  Upon the

20 Appeals Council's denial, the ALJ's decision became the final decision of the Commissioner.  20

21 C.F.R. §§ 404.981, 416.1581.

22 ///

23 ///

24

25 [4]  The RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a
work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.
26 SSR 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's
medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ
27 must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects
of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc.*
28 *Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

## C.     Plaintiff's Contention on Appeal

On April 2, 2013, Plaintiff filed a complaint in this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff contends that the ALJ erred in finding that Plaintiff's migraine headaches were not severe at the Second Step of the five-step sequential evaluation, and also failed to properly consider Plaintiff's need for a cane in developing her RFC.  (Doc. 13, 11, 17.)  Finally, Plaintiff contends new and material evidence submitted to the Appeals Council undercuts the ALJ's decision and renders it unsupported by substantial evidence.  (Doc. 13, 15-17.)

## III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

**A.    The ALJ Erred By Failing to Consider Plaintiff's Migraine Headaches**

### 1.    The ALJ Erred at the Second Step

The ALJ found that Plaintiff had the severe impairments of "status post bilateral total knee replacement, obesity, anxiety, and depression." (AR 24.) Plaintiff claims the ALJ erred by failing

1    to conclude her migraine headaches were a medically determinable impairment and finding them a

2    severe impairment.  (Doc. 13, 13-14.)  Defendant contends the medical evidence does not support

3    a finding that Plaintiff's migraines significantly limited her ability to perform basic work activities

4    and therefore Plaintiff did not meet her burden of showing that her migraines were severe at the

5    Second Step.   (Doc. 16.)   Moreover, the ALJ found Plaintiff had other severe conditions,

6    proceeded with the sequential analysis, and considered all Plaintiff's impairments even those

7    considered non-severe.  As such, any error at the Second Step was harmless.

8         At the Second Step, the ALJ must determine whether the claimant has a medically

9    determinable physical or mental impairment or combination of impairments that is severe and that

10   meets the durational requirement.   20 C.F.R. § 404.1520(a)(4)(ii).   A medically determinable

11   impairment is one which results from anatomical, physiological, or psychological abnormalities

12   which can be shown by medically acceptable clinical and laboratory diagnostic techniques.

13   42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(D); *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 (9th Cir.

14   2005).   A claimant's own statement of symptoms is not enough to establish a medically

15   determinable impairment.  20 C.F.R. § 404.1508, 416.908.

16        An impairment or combination of impairments is "severe" if it significantly limits an

17   individual's ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  An impairment is

18   not severe if it is a slight abnormality that has no more than a minimal effect on an individual's

19   ability to do basic work activities.  Social Security Ruling ("SSR") 96-3p.  The burden is on the

20   claimant to demonstrate a severe impairment.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

21   1999).

22        Here, there was evidence to support a finding that Plaintiff's migraine headaches were

23   severe.  The ALJ gave substantial weight to Dr. Gauch's psychiatric evaluation of Plaintiff (AR

24   29-30), which included a diagnosis of migraines and noted that Plaintiff's medical conditions

25   included "[m]igraine headaches that are familial."  (AR 251, 254.)  Dr. Arellano also prescribed

26   medication to treat Plaintiff's migraines beginning in 2006.  (AR 306.)  Numerous treatment notes

27   mention Plaintiff's migraines, including medications prescribed for migraines, and whether the

28   migraines were "exacerbated," "stable," or "better."  (AR 314, 325, 327, 335, 339.)

1    Plaintiff also testified at the August 3, 2011, hearing about the effects and severity of her

2    migraines.  In response to the ALJ's questions about her migraine headaches, Plaintiff indicated

3    her migraines sometimes lasted up to a week, but recently she had experienced them for two or

4    three days at a time about twice a month.  (AR 53.)  The migraines were worse on one side than

5    the other.  (AR 53.)  When Plaintiff had a migraine, light and noise bothered her.  (AR 53.)

6    Plaintiff would go "into the room" and vomit.  (AR 53.)  Plaintiff's migraine medication could not

7    be taken with hydrocodone, so when she had a migraine she suffered leg pain all day.  (AR 46.)

8    The ALJ is not permitted to ignore significant and probative evidence without explanation.

9    *Flores v. Shalala*, 49 F.3d 562, 571 (9th Cir. 1995); *Vincent v. Heckler*, 739 F.2d 1393, 1394-95

10   (9th Cir. 1984).   The ALJ did not discuss Dr. Gauch's migraine diagnosis, despite that the ALJ

11   credited Dr. Gauch's opinion.  (AR 29-30.)  Further, the ALJ did not acknowledge Dr. Arellano

12   treated Plaintiff for migraines from 2006-2011 and prescribed medication for the condition.  (AR

13   29.)   As this evidence could potentially support a finding that the condition is medically

14   determinable, it should have been considered by the ALJ.  With respect to whether the impairment

15   was severe, although the ALJ summarized Plaintiff's statements regarding her knee pain and her

16   limitations stemming from depression (AR 27), Plaintiff's allegations of migraines and the

17   limitations they posed were never mentioned by the ALJ.

18   While Defendant argues the ALJ found Plaintiff not credible with regard to the extent and

19   scope of her symptomatology, the ALJ's credibility determination was only relevant to Plaintiff's

20   statements about her knee pain and depressive disorder.  Specifically, the medical evidence the

21   ALJ found inconsistent with Plaintiff's lay statements related only to treatment records about her

22   knee and her depressive disorder, and was irrelevant to her complaints of migraine headaches.

23   (AR 29-30.)  The ALJ also noted that Plaintiff's knee "surgery had been successful and her

24   treatment with medications had been effective."  (AR 28.)  However, because the ALJ did not

25   acknowledge the medication Plaintiff was prescribed for her migraines, there is no basis to

26   conclude the ALJ determined Plaintiff's migraine symptoms were effectively controlled with

27   medication.  Rather, the ALJ's statement appears to relate solely to Plaintiff's knee and depressive

28   conditions.  The ALJ also found Plaintiff's lay statements about her conditions less credible due to

1  the extent of Plaintiff's daily activities.  Yet, completing activities such as cooking and cleaning

2  has no nexus to Plaintiff's testimony about her migraines or the limitations she experiences when

3  the migraines occur.  The fact that Plaintiff allegedly suffers debilitating migraines with some

4  frequency would not prevent her from completing the daily activities the ALJ discussed when she

5  was not experiencing headaches.

6       The ALJ is required to specifically identify "what testimony is not credible and what

7  evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

8  1995).   There is nothing in the ALJ's decision that suggests that the migraine symptoms were

9  considered, nor does the evidence the ALJ found to undermine Plaintiff's credibility bear any

10  relation to her migraines.  Because the ALJ's decision is devoid of any discussion related to

11  Plaintiff's migraines, it is unclear that the ALJ's credibility determination encompassed any

12  consideration of Plaintiff's lay statements regarding her migraines.  While the basis for rejecting

13  Plaintiff's statements regarding her severe conditions was not challenged before this Court,

14  Plaintiff's argument that the ALJ ignored the evidence related to her migraines necessarily

15  encompasses the ALJ's credibility determination with respect to Plaintiff's testimony about her

16  migraine symptomatology.

17       As the evidence *could* support a finding that Plaintiff's migraines were severe, the evidence

18  was probative and significant and should have been considered by the ALJ.  The ALJ's complete

19  silence regarding this evidence is error.[5]

20       **2.      The Court Cannot Conclude the Error at the Second Step Was Harmless**

21       Defendant asserts any error at the Second Step is "moot" because the ALJ resolved the

22  Second Step in Plaintiff's favor and continued the sequential analysis.  Defendant notes Plaintiff

23  does not challenge the ALJ's credibility determination, and thus Plaintiff's lay statements

24  regarding her migraines is not competent evidence of any functional limitations.   Because

25  Plaintiff's lay testimony was the only evidence of any limitation stemming from migraines, and

26  this testimony was discredited by the ALJ, there was no limitation to include in the RFC.

27

28  [5] The Court takes no position whether the evidence establishes Plaintiff's migraines were medically determinable or impacted her activities of daily living, or that the evidence was significant and probative of that determination.

1  Defendant maintains the ALJ properly considered all Plaintiff's limitations in determining the
2  RFC.

3      If an ALJ finds one severe impairment exists at the Second Step, all medically
4  determinable impairments must be considered in the remaining steps of the sequential analysis.
5  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§
6  404.1523, 416.945(a)(2).  When an ALJ accounts for resulting limitations later in the sequential
7  process, any error in finding the impairment non-severe at the Second Step is harmless.  *Lewis v.
8  Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

9      Here, the ALJ resolved the Second Step in Plaintiff's favor by finding she had four severe
10  impairments including status post bilateral total knee replacement, obesity, anxiety, and
11  depression.  (AR 24.)  However, there is nothing in the ALJ's decision to indicate that Plaintiff's
12  migraine impairment was considered at the later steps of the sequential evaluation such that the
13  Court can conclude the error at the Second Step was harmless.  The ALJ's discussion of the
14  medical evidence related only to Plaintiff's severe conditions, ignoring references to prescription
15  drug treatment for migraines and a diagnosis of migraines.  Further, as discussed above, the ALJ's
16  credibility determination appears relevant only to the conditions the ALJ found severe.

17      In sum, without a single reference to Plaintiff's allegations and treatment for migraines in
18  the ALJ's decision, the Court is not convinced that the ALJ adequately considered Plaintiff's
19  migraine condition at the later stages of the sequential evaluation.  *Molina v. Astrue*, 674 F.3d
20  1104, 1111 (9th Cir. 2012) (error is harmless only where it is "inconsequential to the ultimate
21  nondisability determination").

22  **B.      The ALJ Adequately Considered Plaintiff's Use of a Cane**

23      Plaintiff asserts that the record demonstrates her use of a cane was both prescribed and
24  necessary.  (Doc. 17, 5.)  Plaintiff argues that the opinions of Dr. Arellano and Dr. Cash provided
25  objective medical evidence of Plaintiff's reliance on the cane through repeated notations that
26  Plaintiff needed the cane to ambulate.  (Doc. 13, 17.)  Further, if the ALJ found the record
27  ambiguous as to the circumstances necessitating her cane, the ALJ had a duty to resolve any
28  ambiguity by developing the record.  (Doc. 17, 6.)  Plaintiff contends that as a result of excluding

1  the need to use a cane in Plaintiff's RFC without discussion, the ALJ's hypothetical and the VE

2  testimony of available jobs failed to accurately reflect Plaintiff's limitations. (Doc. 13, 18.)

3      Defendant responds that, despite Plaintiff's testimony that her cane was prescribed, the

4  record does not contain a prescription. (Doc. 16, 8.)  Defendant contends that Plaintiff failed to

5  demonstrate objective medical documentation as well as a description showing the circumstances

6  for which the cane was needed, as required by SSR 96-9p to document that a cane is medically

7  required. (Doc. 16, 9.)   Therefore, the limitation was not supported by substantial evidence and

8  the ALJ was not required to include it in the hypothetical posed to the VE. (Doc. 16, 9.)

9      **1.      The Medical Evidence Does Not Establish A Cane Was Medically Necessary**

10     At the Fourth Step, the ALJ is required to include limitations which the ALJ finds

11 supported by substantial evidence in the claimant's RFC.  *Rollins v. Massanaria*, 261 F.3d 853,

12 857 (9th Cir. 2001).  The ALJ must consider the whole record and explain how she weighed the

13 medical evidence and testimony.  20 C.F.R. §§ 404.1545, 416.945; SSR 96-5p.   The ALJ is

14 required to consider all limitations and restrictions imposed by all impairments, even those

15 deemed not severe, at the later steps of the sequential evaluation process.  SSR 96-8p (requiring

16 ALJ's RFC assessment to "consider limitations and restrictions imposed by all of an individual's

17 impairments, even those that are not 'severe'").  The ALJ must take into account those limitations

18 supported by the record.  20 C.F.R. §§ 1545(a)(2), 416.945(a)(2); *Bayliss v. Barnhart,* 427 F.3d

19 1211, 1217 (9th Cir. 2005).

20     At the Fifth Step, the hypothetical questions posed by the ALJ to the VE must include all

21 of the claimant's limitations and restrictions.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).

22 The ALJ must only include those limitations supported by substantial evidence in the

23 hypotheticals.  *See Osenbrock v. Apfel,* 240 F.3d 1157, 1163–65 (9th Cir. 2001).   However, an

24 ALJ is not free to disregard properly supported limitations without explanation.  The VE's opinion

25 about a claimant's residual functional capacity has no evidentiary value if the assumptions in the

26 hypothetical are not supported by the record.  *Embrey*, 849 F.2d at 422.  The VE's testimony "is

27 valuable only to the extent that it is supported by medical evidence." *Sample v. Schweiker*, 694

28 F.2d 639, 644 (9th Cir. 1982).  "Reliance on a hypothetical that fails to include all accepted

limitations is insufficient to carry the agency's burden of proving ability to engage in alternative work." *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1231 (E.D. Cal. 2008) (citing *Andrews,* 53 F.3d at 1044 (remanding case to the agency to determine vocational ability based on a hypothetical that accurately reflected the RFC)).

The use of a cane or other "hand-held assistive device" is probative of a claimant's functional limitations only if it is medically required.  SSR-96-9p.  A finding that a hand-held device is medically required necessitates "medical documentation" of the need, supported by an explanation of the circumstances in which it is needed – e.g., "whether all the time, periodically, or only in certain situations; distance and terrain; and other relevant information." *Id.*  Here, the medical evidence does not establish Plaintiff was medically required to use a cane or that it was prescribed.  Dr. Arellano's treatment notes indicate he "began to observe [Plaintiff] using a cane to ambulate and refilled her pain medication at the same dosages."  (AR 27.)  Additionally, Dr. Gauch observed Plaintiff walking with a cane on August 28, 2010, when Plaintiff underwent a mental consultative examination.  (AR 28.)  However, Drs. Arellano and Cash's treatment notes merely state that Plaintiff used a cane, not that the use of one was recommended or medically necessary.  *See* AR 292 (Plaintiff "uses a cane to support herself."); *see also,* AR 288 ("she uses a cane to help her walk"); AR 339, 335, 334, 329, 325, 315, 313, 310 (checking the box for "NAD," indicating Plaintiff "needs assistive device," on treatment notes, with no discussion).  Mentioning the use of a cane neither established Plaintiff needed the cane to balance or walk, nor described the circumstances for which the cane would be needed.  *See* SSR 96-9p.

Plaintiff contends that Dr. Arellano described the circumstances under which Plaintiff required a cane.  (Doc. 17, 5.)  While the treatment notes from Drs. Arellano and Cash observed that Plaintiff used a cane, their treatment notes do not prescribe or demonstrate a medical *need* for her to use a cane.  *See Cashin v. Astrue*, 2010 WL 749884, at *12 (C.D. Cal. Feb. 24, 2010) (physician's "observation that plaintiff needed to use a cane does not constitute an objective finding that plaintiff's cane was medically required").  Specifically, Dr. Arellano noted that Plaintiff used a cane to support herself and to walk, without describing the frequency, terrain, or distance necessitating Plaintiff's use of a cane.  (AR 288, 292.)  Two months after her second knee

replacement in December 2007, Dr. Cash noted that Plaintiff "continue[d] to ambulate with a cane." (AR 228.)  In February 2008, Dr. Cash noted Plaintiff was ambulatory, and in April 2008, that she was "independently ambulatory" as Plaintiff's healing progressed. (AR 226-27.)  Dr. Cash's treatment notes do not mention a cane after April 2008, although the treatment notes discuss Plaintiff's ongoing knee problems.  Further, although Plaintiff testified her cane was prescribed, she points to no prescription in the record. (AR 48.)

The record does not evidence a prescription for the cane, or describe the uses or circumstances in which it was necessary, as required by SSR 96-9p for an ALJ to find it was medically required.  In developing Plaintiff's RFC, the ALJ was required to include only limitations which were supported by substantial evidence.  *Rollins*, 261 F.3d at 857.  The ALJ noted that Plaintiff had used a cane, but also discussed that her knee surgery was successful and her symptoms were stable and treatable.  In light of the fact that the record did not establish that Plaintiff was medically required to use a cane, and the ALJ's discussion of Plaintiff's progress recovering from knee surgery and effective treatment with medication, the ALJ did not err when she did not include use of a cane as a functional restriction in Plaintiff's RFC.

Further, the ALJ was not required to include use of a cane in the hypotheticals to the VE. The ALJ is required to include in hypotheticals to the VE only those limitations supported by substantial evidence.  *See Osenbrock v. Apfel,* 240 F.3d 1157, 1163–65 (9th Cir. 2001).   As the ALJ did not err in failing to include the use of a cane as part of Plaintiff's RFC, the ALJ was not required to include such a limitation in the hypotheticals posed to the VE.

**2.      The ALJ Did Not Have a Duty to Further Develop the Record Regarding Plaintiff's Need to Use a Cane**

Plaintiff asserts that if the record was ambiguous and the ALJ could not determine whether Plaintiff was medically required to use a cane, the ALJ had a duty to develop the record by contacting Drs. Arellano and Cash to request clarification about whether Plaintiff required a cane. (Doc. 17, 6.)

1   An ALJ's duty to develop the record further is triggered only when there is ambiguous
2   evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes*
3   *v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (citing *Tonapetyan v. Halter,* 242 F.3d 1144,
4   1150 (9th Cir. 2001)).   In general, the claimant must prove to the ALJ that the claimant is
5   disabled.  20 C.F.R. § 404.1512(a).  To this end, the claimant must bring to the ALJ's attention
6   everything that supports a disability determination, including medical or other evidence relating to
7   the alleged impairment and its effect on her ability to work. *Id.*  The ALJ has the responsibility to
8   develop "a complete medical history" and to "make every reasonable effort to help [the plaintiff]
9   get medical reports."  20 C.F.R. § 404.1512(d).  If this information fails to provide a sufficient
10  basis for making a disability determination, or the evidence conflicts to the extent that the ALJ
11  cannot reach a conclusion, the ALJ may seek additional evidence from other sources.  20 C.F.R.
12  §§ 404.1512(e); 404.1527(c)(3), *see also Mayes v. Massanari*, 262 F.3d 963, 968 (9th Cir. 2001).

13   Here, the ALJ conducted a review of the record, and in her decision noted that Dr. Nawar's
14  opinion included that Plaintiff was limited to only occasionally climbing ramps and stairs,
15  balancing, stooping, kneeling, crouching, and crawling, and could never climb ladders, ropes, or
16  scaffolds.  (AR 29.)  The ALJ noted that Dr. Arellano reported Plaintiff used a cane, and that Dr.
17  Cash opined Plaintiff's knees limited her ability to ambulate, stand, and climb stairs, but in
18  February 2008 she was ambulatory post-surgery.  (AR 27, 29.)   Upon evaluation of the evidence,
19  the ALJ determined the record was adequate to determine Plaintiff's RFC.  The ALJ sufficiently
20  explained that she credited Drs. Cash and Nawar's assessment of Plaintiff's conditions and
21  discredited Dr. Arellano's opinion because it was conclusory.  (AR 29.)  The ALJ then assigned
22  limitations consistent with the credited physicians' opinions by specifying in Plaintiff's RFC that
23  she could perform sedentary work; lift, carry, push, and pull 20 pounds occasionally and 10
24  pounds frequently; never climb ladders; and occasionally climb stairs, balance, stoop, bend, kneel,
25  crouch, and crawl.  (AR 26-30.)  The ALJ included the limitations she found were supported by
26  substantial evidence in Plaintiff's RFC, and no duty to further develop the record was triggered.
27  ///
28   ///

**B.      New Evidence Submitted to the Appeals Council May Be Considered on Remand**

Plaintiff argues the new evidence submitted to the Appeals Council undercuts the ALJ's decision with respect to Plaintiff's RFC.   The new evidence included additional medical documentation from Dr. Cash dated November 2012.   In this report, Dr. Cash opined that Plaintiff's knee dysfunction caused an inability to sit longer than four hours in an eight-hour workday or to stand for more than 30 minutes.  (AR 390.)  He also opined that Plaintiff must lie down and elevate her legs every two to three hours.  (AR 390.)

Defendant argues that the evidence submitted to the Appeals Council did not change the fact that the ALJ's decision is supported by substantial evidence and thus should be upheld.  (Doc. 16, 9.)   Defendant notes that Dr. Cash's November 2012 report is not supported by any documentation or treating records, thus the objective basis for the opinion is unclear.   While Dr. Cash's November 2012 report states the noted limitations have applied since 2008, the limitations are inconsistent with Dr. Cash's 2008 treatment notes that indicate Plaintiff was doing well and had improved since her knee surgery.

A claimant may submit new and material evidence to the Appeals Council, and the Council is required to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision. *See* 20 C.F.R. § 404.970(b). "Because the regulations require the Appeals Council to review the new evidence, this new evidence must be treated as part of the administrative record." *Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1159-60 (9th Cir. 2012) (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir.1996)).   On appeal, the district court must consider the evidence added to the record by the Appeals Council to determine whether the ALJ's decision was nonetheless supported by substantial evidence and free from error.  *Id.* at 1162; *Taylor v. Comm'r Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011) (courts may consider evidence presented for the first time to the Appeals Council "to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error").

Here, the Appeals Council supplemented the record with additional evidence which included a questionnaire completed by Dr. Cash on November 16, 2012 (AR 390), a questionnaire

1  from Golden Valley Medical Center which stated that Plaintiff's condition was not permanent in

2  the margins along with the doctor's signature (AR 388), and a statement of contentions from

3  Plaintiff's counsel (AR 388).

4        With respect to the questionnaire Dr. Cash completed in November 2012, Defendant is

5  correct that it provides no basis or underlying objective findings to substantiate the limitations

6  opined to in the questionnaire.  Moreover, while Dr. Cash indicated that the limitations set forth in

7  the questionnaire were applicable since 2008, this statement is inconsistent with Dr. Cash's own

8  2008 treatment notes.  As noted by Defendant, Dr. Cash's findings in 2008 were generally normal,

9  indicating Plaintiff had excellent flexion-extension overall in her knee, and she had good collateral

10  and anterior posterior stability.  (AR 224.)  In August 2008, Dr. Cash provided Plaintiff with a

11  neoprene sleeve for improved confidence of function, but recommended she return to activities as

12  tolerated.  Although there are no treatment records in 2009, Plaintiff was examined by Dr. Cash

13  again in 2010.  (AR 221.)  His examination findings indicated Plaintiff had some looseness in her

14  knees bilaterally, she had fair flexion-extension, good collateral and anterior stability, and fair

15  patellofemoral alignment.  (AR 221.)  While the November 2012 questionnaire noted Plaintiff was

16  limited in her ability to ambulate, stand, and climb stairs, Dr. Cash provided no explanation as to

17  the degree of limitation.   The questionnaire completed by Dr. Cash in November 2012 is

18  unsupported and inconsistent with his own treatment records.

19        As to the psychiatric medical source statement submitted to the Appeals Council, this

20  document contains a physician's signature, but also contains notations that the doctor only saw

21  Plaintiff for panic, anxiety, and plantar fasciitis which is not a permanent problem.  (AR 388.)

22  There is also a notation that this "should be [a] treatable problem.   Symptoms are likely

23  exaggerated.  No way permanent."  (AR 388.)  There is also a notation questioning who filled out

24  the substance of the report and noting the form was already filled out, indicating it was completed

25  by someone other than the signing physician.   Thus, the credibility of this report is greatly

26  reduced.

27        The Court does not find that this evidence undercuts the ALJ's consideration of Plaintiff's

28  knee or depressive conditions.  Dr. Cash's November 2012 questionnaire is unsupported by any

clinical findings and is inconsistent with his 2008 treatment notes.  The psychiatric medical source statement contains notations appearing to confirm the ALJ's RFC assessment that Plaintiff's depressive condition is not disabling, and lacks proper indicia of credibility as it was apparently completed in whole or in part by someone other than the treating physician.  Nonetheless, as this case is remanded for reviewed consideration of Plaintiff's migraine impairment, the ALJ may consider this evidence on remand.

## VI. CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence, and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Anabel L. Quintero and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 29, 2014**              **/s/ Sheila K. Oberto**
                                    UNITED STATES MAGISTRATE JUDGE